UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
JOHN BECKER, individually and as President of the
Suffolk County Deputy Sheriffs Police Benevolent
Association; THOMAS BIVONA, individually and as
Treasurer of the Suffolk County Deputy Sheriffs
Police Benevolent Association; TODD COBE,
individually and as Secretary of the
Suffolk County Deputy Sheriffs Police Benevolent
Association; JOHN GOLDBACH, individually and
as Second Vice President of the Suffolk County
Deputy Sheriffs Police Benevolent Association;
ARTHUR SANCHEZ, individually and as
First Vice President of the Suffolk County
Deputy Sheriffs Police Benevolent Association
and the SUFFOLK COUNTY DEPUTY SHERIFFS
POLICE BENEVOLENT ASSOCIATION, and
all those similarly situated,

16-CV-1561          ( )

                              Plaintiffs,                    **COMPLAINT AND
                                                            DEMAND FOR JURY**

              - against -


COUNTY OF SUFFOLK; STEVEN BELLONE
individually and in his official capacity as County
Executive of Suffolk County; SUFFOLK COUNTY
SHERIFF'S OFFICE; and VINCENT F. DEMARCO,
in his official capacity as the Suffolk County Sheriff,

                              Defendants.
----------------------------------------------------------------------X

        Plaintiffs, JOHN BECKER, individually and as President of the Suffolk County

Deputy Sheriffs Police Benevolent Association; THOMAS BIVONA, individually and as

Treasurer of the Suffolk County Deputy Sheriffs Police Benevolent Association; TODD

COBE, individually and as Secretary of the Suffolk County Deputy Sheriffs Police

Benevolent Association; JOHN GOLDBACH, individually and as Second Vice President

1

of the Suffolk County Deputy Sheriffs Police Benevolent Association; ARTHUR SANCHEZ, individually and as First Vice President of the Suffolk County Deputy Sheriffs Police Benevolent Association and the SUFFOLK COUNTY DEPUTY SHERIFFS POLICE BENEVOLENT ASSOCIATION, ("DSPBA" or "Union") (together, "the DSPBA" or "Plaintiffs"), by and through their attorneys GREENBERG BURZICHELLI GREENBERG P.C., as and for their complaint against Defendants COUNTY OF SUFFOLK ("County"), STEVEN BELLONE, individually and in his official capacity as County Executive of Suffolk County, SUFFOLK COUNTY SHERIFF'S OFFICE, and VINCENT F. DEMARCO, in his official capacity as the Suffolk County Sheriff, (collectively, "the County") allege as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Deputy Sheriffs Police Benevolent Association is a police union comprised of individuals employed in the various deputy sheriff titles by the County of Suffolk and the Suffolk County Sheriff's Office.  Individual plaintiffs are Suffolk County Deputy Sheriffs, Deputy Sheriff Investigators, and Deputy Sheriff Supervisors.  Named plaintiffs are the executive board members of the DSPBA who, as Union officials and as private citizens, individually and collectively, have been a loud and consistent voice for the interests of the Union's membership and for the cause of better, more effective governing in Suffolk County.  Their advocacy efforts have taken many forms, including public speech-making, comments to the media and before the County's legislature, and various types of litigation to enforce contractual and statutory rights.

2.     Through the years, the Union has acted to advance the interests of its membership through political speech, typically in the form of official endorsements of

2

candidates for public office, providing financial support of their campaigns and initiatives, as well as providing manpower in working phone banks and leafleting for various campaigns. The Union has also, more recently, stepped up its associational activities by speaking before the legislature on matters of public concern, by holding rallies outside governmental meetings and governmental ceremonies, and by initiating legal actions to ensure the County lives up to its contractual and statutory obligations.

3.    In recent years, the DSPBA leadership has been particularly focused on the candidates for the position of County Executive. Considering the influence the County Executive has and the magnitude of the issues at stake, the DSPBA has been especially outspoken in the recent election cycles.

4.    To wit, in 2011, the DSPBA endorsed and actively campaigned for then Suffolk County Treasurer, and Republican candidate, Angie Carpenter, since she was aligned with the values and championed the issues which are of the utmost concern to the DSPBA's membership. The Union supported Ms. Carpenter in her bid for the County Executive seat by distributing political literature, making phone calls on her behalf, and donating to her campaign.

5.    As active champions for Ms. Carpenter, the DSPBA also vehemently opposed Democrat Steven Bellone's bid for County Executive. The Union's opposition to Bellone was motivated by Plaintiffs' sincere and genuine belief that his policy prescriptions for the Sheriff's Office would undermine the ability to more efficiently deliver law enforcement services throughout the County.

6.    In the November 2011 election, Bellone defeated Carpenter and later assumed office on January 1, 2012 as County Executive.

3

7.    Since the time Bellone took office, he has targeted those who opposed him. His first order of business was to reward a police union that supported him – the Suffolk County PBA – while simultaneously exacting retribution on the DSPBA, a smaller but no less politically active police union, for failing to support his campaign.

8.    Less than nine months in office, Bellone reached a new labor contract with the PBA which, among other things, explicitly called for the removal of the Sheriff's Deputies from patrol and enforcement functions of Suffolk's highways and the replacement of them by PBA members. This action directly breached the terms of a job security agreement the DSPBA entered into with the prior County administration one year earlier.

9.    Bellone signed off on this retaliatory move and the County blessed it as part of a larger contract despite the well-publicized cost-savings that inured to the benefit of taxpayers by maintaining the Deputies on the highways.

10.    In a decision issued in late February 2014, the Suffolk County Supreme Court upheld the validity of the DSPBA job security agreement with the County. Enforcement of that agreement has been stayed, however, pending the County's appeal.

11.    Embittered by the trial court's decision, on or about April 11, 2014, Bellone directed the head of his Office of Labor Relations to eliminate one of the DSPBA's executive board release positions, restricting the Union's ability to represent its membership fairly, timely, and efficiently. While later returned to the DSPBA, Bellone continued to step up his vindictive attacks.

12.    As Chief Executive Officer of the County, Bellone further revealed his malice by entering into successor Agreements with each and every one of the Police Department and Sheriff's Office bargaining units, except for the DSPBA.  And despite public comments by his spokespersons to the contrary, Bellone has continued to evade and downright refused to reach a similar Agreement with the DSPBA leadership.

13.    Bellone is now unlawfully tying any meaningful negotiations on an employment contract with the DSPBA to the settlement of the ongoing litigation against the County for the removal of the Deputies from the highways.  In this way, Bellone has manipulated the Union by forcing the leadership to do the impossible:  choose between dropping the lawsuit the Union won against the County, thereby foregoing job security and deferred wages or continue without a contract settlement indefinitely when all other law enforcement units continue to reap wage increases and other sizable benefits.

14.    As of the date of this filing the DSPBA still does not have a contract, and has not had one for more than five years, since Bellone was first elected to office.

15.    Bellone took all of these retaliatory and damaging actions against the DSPBA for its political advocacy and its campaign against him.

16.    In late-2015 Bellone ran for reelection.

17.    Again, the Deputies chose not to support Bellone in his bid for a second term based upon his continuous mistreatment of the Deputies.

18.    The Deputies spoke out against Bellone, appearing before public legislative sessions and meeting with legislators to push back against Bellone's governing tactics.  DSPBA President John Becker appeared before the Legislature on numerous occasions, as did other members of the DSPBA board.

5

19.    DSPBA President Becker appeared before the Legislature on numerous occasions, to highlight Bellone's mistreatment of the Deputies, unilaterally rescinding the 2011 agreement that has been the subject of protracted litigation and tying up contract negotiations, leaving the Deputies without a contract since December 31, 2010.

20.    Days after his re-election, Bellone directed the head of the Office of Labor Relations to notify the DSPBA that it was planning to withhold the roughly $4 million in wages that DSPBA members had deferred in 2011 and were entitled to on December 31, 2015.

21.    Efforts to reach out to Bellone about this message went unanswered and, after the DSPBA held a rally at his inauguration, Bellone refused to return the $4 million in wages the next day, as contractually required.

22.    Even though legally required to repay the $4 million in wages, Bellone again retaliated against the Deputies for their political advocacy and for their failure to support his bid for election and re-election.

23.    The list of Bellone's retaliatory action reads like a "how to" book in ways to violate the First Amendment protections and contractual rights of employees.   He repudiates contractual obligations to have the Deputies patrol the highways, yet keeps the benefit of that contract by retaining the Deputies' deferred compensation – more than $4 million – beyond the prescribed term in the contract.  After his removal of the Deputies from the highways, he snatched back an executive board member leave time so that the Union was left short-handed to address member issues.  And he has continued to starve out the Deputies- denying them the return of their own past-due

6

deferred compensation and any meaningful prospect of a new contract, hoping they will accede and be left no meaningful redress for these unlawful misdeeds.

24.    Plaintiffs, like all Americans, enjoy the full protection of the First Amendment, which prohibits government officials from taking official action against persons based upon the content of their speech and associational activities.

25.    The First Amendment's free speech guarantee is at its most robust in the context of speech which goes to the core of the democratic process – that is, speech surrounding an election and speech before the Legislature.

26.    Defendants' retribution, denying the repayment of deferred wages due to Plaintiffs, is unconstitutional and must be reversed.

27.    Defendants' actions have a chilling effect, and are designed to silence the DSPBA and its membership, or at least to punish them for speaking out, and must be lifted.

28.    Plaintiffs must be compensated for the significant financial and other losses they have suffered as a result of Bellone's retaliatory action.

## JURISDICTION AND VENUE

29.    This action asserts claims arising from Defendants' violations of Plaintiffs' rights to free speech and equal protection of the laws under the First and Fourteenth Amendments to the United States Constitution, 42, U.S.C. § 1983, and the Constitution of the State of New York.  In it, Plaintiffs seek compensatory and other damages.

30.    This action also asserts state law claims for breach of contract, which this Court has supplemental jurisdiction over pursuant to 28 U.S.C. § 1367.

31.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and  1367.  Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as a substantial part of the acts or omissions giving rise to the claim arose in this district.

## DEMAND FOR TRIAL BY JURY

32.     Plaintiffs demand a trial by jury in this action.

## THE PARTIES

33.     Plaintiff John Becker is a resident of Suffolk County, State of New York, and a citizen of the United States.  Becker is and has been a sworn and dedicated member of the Suffolk County Sheriff's Office since April 22, 2002, presently holding the title of deputy sheriff.  Since January 1, 2014, Becker has held the post as President of the DSPBA and, as such, is a member of its Executive Board, having been duly elected to this post by the Union membership.  In his capacity as Union President and as a private citizen, Becker has been and remains the Union's public spokesman, and a forceful and outspoken personal advocate for Deputy Sheriffs and law enforcement officers throughout Suffolk County.

34.     Plaintiff Thomas Bivona is a resident of Suffolk County, State of New York, and a citizen of the United States.  Bivona is and has been a sworn and dedicated member of the Suffolk County Sheriff's Office since November 29, 2010, presently holding the title of deputy sheriff.  Since April 2014, Bivona has held the post as Treasurer of the DSPBA and, as such, is a member of its Executive Board, having been duly elected to this post by the Union membership.  In his capacity as Union Treasurer and as a private citizen, Bivona has been and remains a forceful and outspoken

8

personal advocate for Deputy Sheriffs and law enforcement officers throughout Suffolk County.

35. Plaintiff Todd Cobe is a resident of Suffolk County, State of New York, and a citizen of the United States. Cobe is and has been a sworn and dedicated member of the Suffolk County Sheriff's Office since March 29, 1993, presently holding the title of deputy sheriff sergeant. Since 1998, Cobe has held a position on the DSPBA's Executive Board, holding various titles, from Secretary to President, currently holding the position as Secretary. Cobe was duly elected to be a member of the Executive Board by the Union membership. In his capacity as Union officer and as a private citizen, Cobe has been and remains a forceful and outspoken personal advocate for Deputy Sheriffs and law enforcement officers throughout Suffolk County.

36. Plaintiff John Goldbach is a resident of Suffolk County, State of New York, and a citizen of the United States. Goldbach is and has been a sworn and dedicated member of the Suffolk County Sheriff's Office since May 22, 1995, presently holding the title of deputy sheriff investigator. Since July 2008, Goldbach has held a position on the DSPBA's Executive Board, holding various titles, from Secretary to Second Vice President, a position he currently holds. Goldbach was duly elected to be a member of the Executive Board by the Union membership. In his capacity as Union officer and as a private citizen, Goldbach has been and remains a forceful and outspoken personal advocate for Deputy Sheriffs and law enforcement officers throughout Suffolk County.

37. Plaintiff Arthur Sanchez is a resident of Suffolk County, State of New York, and a citizen of the United States. Sanchez is and has been a sworn and dedicated member of the Suffolk County Sheriff's Office since May 5, 1997, presently holding the

9

title of deputy sheriff.  Since January 1, 2012, Sanchez has held a position on the DSPBA's Executive Board, holding various titles, from Secretary to First Vice President, a position he currently holds.  Sanchez was duly elected to be a member of the Executive Board by the Union membership.  In his capacity as Union officer and as a private citizen, Sanchez has been and remains a forceful and outspoken personal advocate for Deputy Sheriffs and law enforcement officers throughout Suffolk County.

38.    The DSPBA is an incorporated not-for-profit association with its principal place of business in Suffolk County.  It is an employee organization within the meaning of § 201 of the Public Employees' Fair Employment Act (New York State Civil Service Law § 200 et seq., commonly known as the "Taylor Law") and is the sole, exclusive, and recognized collective bargaining representative for all Deputy Sheriffs below the rank of Chief employed by the County of Suffolk.  The DSPBA represents approximately 250 members in labor contract negotiations, contract administration, and other labor and employment related matters.  The DSPBA and Defendant County of Suffolk and Sheriff's Office are parties to a collective bargaining agreement that expired on December 31, 2010.

39.    Defendant County of Suffolk is a municipal corporation incorporated under the laws of the State of New York, with its County seat in Hauppauge, Suffolk County, New York.  The County is a public employer under the Taylor Law and a signatory to the 2011 Memorandum of Agreement with the DSPBA and the Suffolk County Sheriff Vincent F. DeMarco ("2011 DSPBA Agreement" or "2011 Agreement").

40.     Defendant Steven Bellone is the duly elected Executive of the County of Suffolk (the "County Executive").  He is being sued both individually and in his official capacity as County Executive.

41.     Defendant Suffolk County Sheriff's Office is a public employer under State law and is the joint employer, along with the County of Suffolk, of all employees in the various Deputy Sheriff titles who are members of the DSPBA.

42.     Defendant Vincent F. DeMarco is the duly elected Sheriff of the County of Suffolk and has served in that position since January 1, 2006.  He is being sued in his official capacity.

## BACKGROUND

2011 DSPBA Agreement – Job Protection and Wage Deferral

43.    On September 15, 2008, during the tenure of former County Executive Steve Levy, members of the DSPBA began exclusively patrolling the Long Island Expressway and Sunrise Highway (collectively, the "highways") within the Suffolk County police district.  Since 2008, this assignment has been contentious, and has prompted a sort of turf war between County agencies, namely the Police Department and the Sheriff's Office.

44.    In 2011 incumbent Suffolk County Executive Steve Levy announced that he was not running for re-election.

45.    Uncertain about upcoming election results, and seeking job security for its members, the Union negotiated and reached an agreement with the County and Sheriff's Office to provide continued certainty in the assignment of patrol and enforcement police work on the highways.

46.    On September 20, 2011, the parties entered into the 2011 Agreement, whereby the DSPBA agreed to defer certain monies due to their members as a result of a contract interest arbitration covering the period January 1, 2008 through and including December 31, 2010.  In exchange, the DSPBA and its members received certain job security protections, among other items.

47.    Specifically, the 2011 DSPBA Agreement provides:

> All monies due to employees which are deferred pursuant to this Agreement shall be repaid to employees as follows:  (a) **Employees shall receive from the County any deferred monies due to them on December 31, 2015** or upon any type of separation from employment if it occurs prior to December 31, 2015…(b) Deferred monies shall be repaid at the rate of salary in

12

effect for the member as of December 31, 2013, which shall include, but not be limited to, any promotions, upgrades, salary increases, step increase, increments, etc., enjoyed by the member between the date of the Agreement and the time of repayment of the monies... (Emphasis added).

48. In exchange for deferring the aforementioned monies, the DSPBA protected and maintained official command duties and responsibilities, obtaining job security, among other items through 2017. Among the official command duties and responsibilities that were protected and covered by this 2011 Agreement is the patrol and enforcement functions of Suffolk's highways.

49. At the time the parties entered the 2011 MOA, the County Executive's Office and the Suffolk County Legislature's Budget Review Office valued these deferrals at approximately $4 million.

50. Confirming this estimation, the Suffolk County Legislature voted for a County budget that included the $4 million figure for the deferred savings to be realized in its 2012 fiscal year by the 2011 DSPBA Agreement.

## 2011 Election

51. In September 2011 the DSPBA declared its support of Angie Carpenter, a Republican, for County Executive, in part because she supported the Deputies and their continued presence on the LIE and Sunrise Highway.

52. The DSPBA, its Executive Board, and its members were vocal champions of Ms. Carpenter and supported her campaign against Democrat Steven Bellone, participating in phone banks, leafleting, and financially backing her bid to take the County Executive's seat.

53.    In November 2011, Bellone handily defeated Ms. Carpenter and assumed office in January 2012.

## 2011 – 2014: The History of Conflict Between Bellone and the DSPBA

54.    Upon assuming office, Bellone battled the DSPBA at every possible turn, dishonoring the 2011 DSPBA Agreement, refusing to settle ongoing contract negotiations, and eliminating a Union release position, among other actions.

55.    In mid-2012, less than a year in office, Bellone entered an 8-year contract with the Suffolk Police Benevolent Association, a much larger police union, which had supported Bellone's candidacy.  As part of that contract, Bellone purported to award patrol and enforcement functions of Suffolk's highways to PBA members ("2012 PBA Agreement").

56.    When Bellone entered into the 2012 PBA Agreement, he knew its terms – the return of PBA members to the highways – were in direct contravention to the 2011 DSPBA Agreement.

57.    And in October 2012, Bellone sought to make good on his promise to the PBA by replacing Deputies with PBA members on the LIE and Sunrise Highway, thereby breaching the 2011 DSPBA Agreement.

58.    The DSPBA took decisive action in response, pursuing a state court action and an improper practice charge at the New York State Public Employment Relations Board to enforce the 2011 DSPBA Agreement.

59.    When the DSPBA was able to obtain a temporary restraining order for a short period of time, then Director of Labor Relations, Paul Margiotta, conveyed to

14

former DSPBA President Anthony Prudenti that the DSPBA's court filings would prevent Bellone from reaching any Agreement with the Union, and indicating that their relationship was now at a standstill.

60.    On February 27, 2014, Judge Peter H. Mayer of the Suffolk County Supreme Court ruled that the "2011 MOA is a valid agreement." (Prudenti v. County of Suffolk, Suff. Cty. Sup. Ct., Index No. 3255/2012).

61.    Although the DSPBA won the state court action, the County appealed the February 27th decision to the Second Department and an automatic stay is in place. (Docket Nos. 2014-03494 and 2014-10690).

62.    Angry over the court's decision and the DSPBA's associational activities to enforce its rights, Bellone continued to obstruct the Deputies.  In April 2014, he authorized the improper rescission of one of the two long-held DSPBA release positions, slashing the Union's ability to represent its membership in half and stimulating a hostile bargaining relationship.

63.    To move negotiations ahead and more vocally express displeasure with the governing tactics of the County, DSPBA President John Becker appeared before the Legislature on numerous occasions, as did other members of the DSPBA board, in order to obtain support from the legislators, and to encourage Bellone to come to the bargaining table.

64.    Bellone treated the job security provisions of the 2011 DSPBA Agreement as a nullity, even after Judge Mayer declared the contract valid and enforceable.

65. However, he did not treat the entire 2011 DSPBA MOA as a nullity, as he and the County continued to maintain the $4 million in wage deferrals which inured to the benefit of the County.

66. These monies, which were originally due to the Deputies following the issuance of the 2011 interest arbitration award, were deferred through the end of 2015.

67. Upon information and belief, all those that separated from service prior to December 31, 2015, were paid out monies owed in accordance with the 2011 DSPBA Agreement.

68. On October 2, 2014, DSPBA President Becker appeared before the Public Safety Committee of the Suffolk County Legislature to voice his and his members' frustration with the County's refusal to engage in meaningful negotiations, his and his members' displeasure over the County's handling of highway patrol and enforcement assignments, as well as advocating for additional budget allocations to hire new Deputy Sheriffs to backfill retirements, allocations which would seek to shore up and avoid compromising programs administered by the Sheriff's Office Domestic Violence Unit, among other programs.

69. Five days later, at the General Meeting of the full Suffolk County Legislature, Becker spoke publicly about the County Executive's budget not containing a 2015 budget line for the return of the $4 million in wages his members deferred in 2011. He explained:

> The County did not return the $4 million and to date has made no budgetary allocation to pay back that money. Instead, thousands and thousands of taxpayer dollars are spent litigating this [2011 DSPBA] agreement, which Judge Mayer has already ruled was a valid agreement. So the question remains why not simply negotiate the issue? When the appeals and the motions are settled

and the case finally goes before an arbitrator, the cost to the County will no doubt be substantial.

Additionally, we are now approaching our fifth year with no contract, yet we see other unions enjoying the benefits of long-term deals and raises....

We also see no plan for hiring new Deputy Sheriffs in the upcoming Police Academy. Our last hiring only allowed for two Deputy Sheriffs. And with a large number of retirees over the last two year[s], we see our numbers dwindling down. We need to make sure that there's a sufficient number of Deputy Sheriffs to perform the jobs so public safety isn't compromised.

70. DSPBA 1st Vice President Arthur Sanchez, then the Union's Recording Secretary, also spoke up at the Legislature, explaining the continued hard work of DSPBA members despite not being treated fairly by Bellone in contract negotiations and imploring the Legislature to make sure that the money already earned by Deputies be included in the 2015 Operating Budget.

71. Two weeks later, on October 21, 2014, Becker appeared before the Legislature's Public Safety Committee once again, focusing specifically on ensuring money is earmarked in the 2015 Operating Budget to comply with the 2011 DSPBA Agreement and also pushing for increased staffing.

## 2015: Bellone's Re-Election and His Continued Conflict with the DSPBA

72. Bellone sought re-election in 2015.

73. Given his continued hostility towards the Deputies, the DSPBA did not endorse him again.

74. Negotiations for a new labor contract, one that expired on December 31, 2010, continued through 2015.

17

75.   In the summer of 2015, the County refused to provide necessary and relevant information to assist the parties in their negotiations.  It further began to modify, without explanation, the value (cost and savings) of different proposals. The County repeatedly denied requests for copies of or access to financial information relied upon by and associated with the County's costings and financial analyses.

76.   As Bellone's campaign for re-election ramped up, so too did Bellone's vindictive, retaliatory actions against the DSPBA.

77.   On August 10, 2015, Labor Relations Director Jennifer McNamara conveyed that the County was "not willing to do a contract that does not include the highway."  This, according to McNamara, came from conversations directly with Chief Deputy County Executive Dennis Cohen and was, upon information and belief, at the explicit direction of Bellone.

78.   On October 1, 2015, DSPBA President Becker again appeared at the Legislature's Public Safety Committee.  This time, he expressed the DSPBA's willingness to negotiate a successor labor contract and to resolve their long-standing dispute over highways.  Becker focused on the cost and length of the battle, expressing his disappointment that the County refuses to focus on the issue.  Again Becker expressed concern that the County would not pay his members back the $4 million in wages already earned.

79.   Five days later, Plaintiffs Becker, Sanchez, and Bivona appeared before the full County Legislature to highlight the work of Deputy Sheriffs, push for a contract which would produce significant savings for the County, and reminded the Legislature again that there was $4 million in wages already earned coming due.

80. One month later, Bellone was re-elected to a second term as County Executive.

81. The County's failure to respond and its other recent actions – in denying information and in trying to tie a contract settlement to the Union's settlement of the ongoing state court litigation – prompted the DSPBA to file another improper practice charge before PERB (Case No. U-34663) on November 16, 2015. In this charge, the DSPBA alleged the County's actions to be bad faith bargaining and in contravention of New York State's Taylor Law.

Bellone's Retaliatory Denial of $4 Million in Deferred Wages

82. In the days immediately following his re-election, Bellone was at the height of his political powers. With a full year term still yet to begin, the days following his re-election afforded Bellone the perfect opportunity to take revenge on his political opponents – and the Plaintiffs were at the top of his list of targets.

83. Accordingly, Bellone determined that the time to strike back at Plaintiffs was at hand. Upon information and belief, on November 16, 2015, the same day that the DSPBA filed its improper practice charge of bad faith bargaining, and just 13 days after his election, the County's Director of Labor Relations, at Bellone's direction, informed DSPBA President Becker that the County was planning not to pay him or his members the wages they earned (from 2008 through 2010) but deferred and were owed on December 31, 2015.

84. The message delivered by Bellone's Labor Relations Director openly threatened to withhold millions of dollars in wages already earned. They did so under

the guise that the highway dispute was still to be litigated.  Yet, there was no basis for that reasoning – either the agreement was valid and deferred wages had to be paid out or the agreement was not valid and the wages should have been paid out much earlier; in either scenario the deferred wages were required to be paid no later than the end of 2015.

85.    The context and timing of the message delivered by the Labor Relations Director that the wages were not going to be paid out was designed not only to retaliate against, but also to chill, inhibit, and intimidate Plaintiffs in their speech and associational activities.

86.    But the DSPBA's advocacy for its members continued, now more publicly than ever.

87.    While speaking before a General Meeting of the full Legislature on November 17, 2015, President Becker highlighted Bellone's treatment of DSPBA members stating: "The County Executive and his Administration should be ashamed to treat the people who put their lives on the line for the people of the County in such a disrespectful and appalling manner."

88.    DSPBA Treasurer Thomas Bivona also railed against Bellone at the Legislature's General Meeting on November 17, 2015, stating "This unfair treatment, is this bestowed upon us because we're such a smaller union and we're unable to make donations and political generosity?...We are now the only police union in the County that are not current in contract."

89.    Also speaking on behalf of the DSPBA and the issues it advocated were then-Secretary (and now First Vice President) Arthur Sanchez, Second Vice President

John Goldbach, the Suffolk County Sheriff himself, and Charles McArdle, President of the relatively newly formed Eastern Long Island Police Conference.

90.   Thereafter, on or about December 15, 2015, DSPBA President Becker wrote a letter to Bellone requesting that he respond with the County's official position with regard to its obligation to remit contractual payments to Deputy Sheriffs by December 31, 2015.

91.   This letter was ignored by Bellone.   To date no County official has responded.

92.   Hearing no response from Bellone, the DSPBA protested at Bellone's inauguration on December 30, 2015.   Dozens of deputies, their families, and other supporters stood outside Suffolk Community College, where Bellone was to give his inauguration address and be joined by Governor Andrew Cuomo and other federal, state, and local public officials.

93.   DSPBA President Becker and dozens of members of the DSPBA, and their families, spoke out against Bellone, spotlighting his failure to negotiate and settle a contract with the DSPBA, his failure to respond to the Deputies, and his plans to refuse to repay deferred monies.

94.   In response to the DSPBA's activism before the Legislature, their continued public speech and associational activities, and after securing his bid for re-election, ensuring another four years as the head of the County's government, Bellone took decisive action against the Deputies.

95.   As promised by the Director of Labor Relations, on December 31, 2015, Bellone directed that the County withhold payment of the $4 million in deferred wages

then owed under the 2011 DSPBA Agreement, wages which were earned for services performed from 2008 through 2010.

96.    Bellone again retaliated against the Deputies, seeking to silence them once and for all, and harming them in their pockets, where they would feel it the most.

97.    To date, no active DSPBA member that has deferred wages under the 2011 DSPBA Agreement has received their deferral monies.

98.    Bellone's refusal to pay $4 million in back wages was most blatantly a way to get back at the Deputies for their involvement in the political process and for their outspokenness.   Significantly, the denial of deferred wages, in continued breach of the 2011 DSPBA Agreement, aimed at Plaintiffs, who are persons and an organization directly and personally responsible for organizing political activities in opposition to Bellone, amounts to retaliation – official government action designed to punish specific persons for the content of their speech and associational activities on issues of intense public concern and for other constitutionally-protected conduct.   Bellone made these decisions, and ordered these actions, as chief policy-maker for the County of Suffolk, and as a matter of policy.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (42 U.S.C. § 1983 / First Amendment / U.S. Constitution)

99.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "98" as if fully set forth herein.

100.    The First and Fourteenth Amendments to the United States Constitution prohibit defendants from abridging Plaintiffs' right to free speech, to petition government, and to associate with others for these purposes, and it provides sanctions

where defendants retaliate against persons in Plaintiffs' position based upon the exercise of their free speech rights.

101.    Plaintiffs' activities, as described above, constitute speech on matters of public concern, petitioning activities, and associational activities, all of which are protected by the First Amendment.

102.    By committing the acts described above, and by breaching the terms of a negotiated agreement, refusing to pay deferred wages, slashing union excused time, and tying contract negotiation to the settlement of ongoing litigation, Defendants, acting through Bellone, unlawfully retaliated against Plaintiffs for the lawful exercise of their right to free speech, petition, and association as guaranteed by the United States Constitution.

103.    By singling out DSPBA members for unequal, retaliatory, and vindictive treatment in response to the exercise of their rights as guaranteed by the First Amendment, Defendants, acting through Bellone, deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including without limitation, rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

104.    Defendant Bellone acted at all times under color of state law. Said acts by Bellone, undertaken in his official role as County Executive, a policy-maker for the County, were without authority of law, and an abuse of his powers. Bellone acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the First and Fourteenth Amendments to the United State Constitution.

105. By singling out the Plaintiffs for retaliatory, vindictive, and unequal treatment with the intent to suppress and/or chill its protected activities, Defendants, acting through Bellone, violated the Plaintiffs' First and Fourteenth Amendment rights.

106. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs have individually suffered and continue to suffer actual damages, in forms including but not limited to lost income, lost future earning, pension reductions and mental anguish pain and suffering. Additionally, as a direct and proximate consequence of being singled out for retaliatory and unequal treatment as alleged above, Plaintiffs' First Amendment activities have been chilled.

### AS AND FOR A SECOND CLAIM FOR RELIEF
(New York State Constitution, Art. 1, Section 8)

107. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "106" as if fully set forth herein.

108. By denying Plaintiffs their deferred wages, solely in response to their political activism and their exercise of free speech, Defendants deprived Plaintiffs of rights, remedies, privileges and immunities guaranteed to every citizen of the State of New York by the New York Constitution.

109. Bellone acted under pretense and color of state law and in his individual and official capacities and within the scope of his employment. Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, wantonly, and knowingly, and with the specific intent to deprive Plaintiffs of their right to free speech as secured by the New York Constitution.

110. As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs suffered and continue to suffer actual damages, in forms including but not limited to lost income, lost future earnings, pension reductions and mental anguish, pain and suffering.

## AS AND FOR A THIRD CLAIM FOR RELIEF
(Breach of Contract)

111. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "110" as if fully set forth herein.

112. Plaintiff DSPBA and Defendants County of Suffolk and Sheriff's Office were parties to the 2011 Agreement.

113. They entered the Agreement at arm's length.

114. Pursuant to the Agreement the DSPBA deferred roughly $4 million wages already earned in exchange for job security, among other things.

115. Defendants have breached the Agreement by refusing to pay the deferred wages compensation in accordance with the agreed upon December 31, 2015 deadline.

116. The DSPBA is damaged by the loss of $4 million.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
(Declaratory Relief)

117. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs numbered "1" through "116" as if fully set forth herein.

118. Plaintiffs seek a declaration that Defendants, under color of state law, abridged the protections guaranteed to Plaintiffs pursuant to the First and Fourteenth

Amendments of the U.S. Constitution and Article I, Section 8 of the New York State Constitution.

119.    Plaintiffs further seek a declaration that Defendants are obliged to repay $4 million in wage deferrals to Plaintiffs, now with interest at the statutory rate.

WHEREFORE, Plaintiffs demand judgment:

a. On the first cause of action,

    1. Declaring that Plaintiffs' constitutionally protected rights to free speech and association were violated by Defendants;

    2. An award of compensatory damages in an amount to be determined at trial;

    3. An award of punitive damages against Bellone in an amount to be determined at trial;

b. On the second cause of action, declaring that Defendants' violated Plaintiff's rights to free speech as secured by the New York State Constitution and awarding Plaintiffs compensatory damages;

c. On the third cause of action, directing the County, County Executive, Sheriff's Office, and Sheriff to abide by the deferral provision articulated in the 2011 DSPBA Agreement, specifically paying all DSPBA members their deferred monies, along with any interest, where Defendants' actions constitute a breach of the 2011 Agreement;

d. On the fourth cause of action, declaring Defendants violated the First and Fourteenth Amendments of the U.S. Constitution, the New York State Constitution, and breached the terms of the 2011 DSPBA Agreement, and directing Defendants to pay Plaintiffs $4 million in deferred monies owed, with interest; and

e. Such other, further, and different relief as this Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action, pursuant to 42 U.S.C. § 1988.

Dated: Lake Success, New York
March 30, 2016

Greenberg Burzichelli Greenberg P.C.

By: _____

Seth H. Greenberg, Esq.
Genevieve E. Peeples, Esq.

3000 Marcus Avenue, Suite 1W7
Lake Success, New York 11042
(516) 570-4343